## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL BERNSTEIN, Derivatively on Behalf of Nominal Defendant UiPATH, INC., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL DINES, ASHIM GUPTA, PHILIPPE BOTTERI, CARL ESCHENBACH, MICHAEL GORDON, KIMBERLY L. HAMMONDS, DANIEL D. SPRINGER, LAELA STURDY, JENNIFER TEJADA, RICHARD P. WONG, and THOMAS MENDOZA, <br><br> Defendants, <br><br> and <br><br> UiPATH, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER** <br> <u>**DERIVATIVE COMPLAINT**</u> <br><br><br> <u>JURY TRIAL DEMANDED</u> |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Michael Bernstein ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant UiPath, Inc. ("UiPath" or the "Company"), against current and former members of UiPath's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and

Exchange Commission ("SEC") filings, press releases published by and regarding UiPath, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information, including a class action complaint, captioned *Gera v. UiPath Inc. et al*, 1:23-cv-07908 (S.D.N.Y.) (the "Securities Complaint"), in an action alleging violation of the federal securities laws by the Company and certain of its directors and officers (the "Securities Class Action").

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of UiPath against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least April 21, 2021 and March 30, 2022 (the "Relevant Period") as set forth below.

2.      UiPath is a global Robotic Process Automation ("RPA") software company founded in 2005. RPA software allows companies to use software "bots" to automate repetitive or mundane tasks including extracting information from documents, data entry, and data management, allowing company employees to prioritize more complex or strategic tasks.

3.      On April 21, 2021 UiPath completed its initial public offering ("IPO"), issuing more than 27.5 million shares at a price of $56 per share for gross proceeds of over $1.5 billion. Leading up to the IPO and in the months that followed, the Individual Defendants overstated UiPath's total addressable market ("TAM") and misleadingly touted demand for the Company's software products. In reality, the Company was losing market share to established enterprise software providers like Microsoft, IBM, and Salesforce who were able to incorporate automation software into their existing platforms. Further, UiPath was losing market share to relatively inexpensive, low-code automation solutions like Microsoft's Power Automate.

4.      Rather than disclose these adverse demand and competition trends, the Individual Defendants enacted a scheme to conceal the diminishing demand for UiPath's software. First,

2

UiPath implemented widespread discounts to temporarily enhance sales. As this strategy was unsustainable, the Company then began introducing "ramping" contracts involving relatively modest initial RPA commitments which could ostensibly grow over time. Due to the unique way in which the Company reported annualized revenue and growth figures, these ramping contracts created illusory demand growth.

5.     With the price of UiPath stock artificially inflated as a result of the scheme, Company insiders offloaded millions of dollars' worth of their personal holdings of Company stock. The truth with respect to the fraudulent scheme gradually emerged with a series of partially corrective financial disclosures beginning in September 2021. After UiPath reported disappointing financial results in September 2021 and March 2022, the price of Company stock plummeted to a low of $22 per share, more than 75% below the Relevant Period high price of $90 per share.

6.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial harm, including the costs of defending against and potential class-wide liability in the Securities Class Action, as well as additional damages, including reputational harm and loss of goodwill.

7.     Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act. Demand is excused because each member of the Board faces a substantial likelihood of liability for the misconduct alleged herein.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)).

9.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

10.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b)(1) and §27(a) of the Exchange Act (15 U.S.C. §78aa(a)). At all relevant times, UiPath conducted substantial business in this District. In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

## PARTIES

### *Plaintiff*

13.     Plaintiff is, and has been continuously throughout all times during the Relevant Period, the owner of UiPath common stock.

### *Nominal Defendant*

14.     Nominal defendant UiPath is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York. The Company's stock trades on the New York Stock Exchange under the ticker "PATH."

### *Individual Defendants*

15.     Defendant Daniel Dines ("Dines") is, and at all times relevant hereto has been, Chairman of the Board and UiPath's CEO. According to the Company's public filings, Defendant Dines received $669,646 in compensation from the Company during the fiscal year ended January

31, 2022. As of April 18, 2023, Defendant Dines beneficially owned 27,011,840 shares of Class A common stock and 82,452,748 shares of Class B common stock,[1] collectively worth more than $1.7 billion and constituting 86.6% of the total voting power in the Company.[2] During the Relevant Period, Defendant Dines sold over $77 million worth of Company shares in the IPO and another $2.6 million worth of shares shortly thereafter at artificially inflated prices.

16.     Defendant Philippe Botteri ("Botteri") is, and at all times relevant hereto has been, a member of the Board. Defendant Botteri serves as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Botteri received $948,046 in compensation from the Company during the fiscal year ended January 31, 2022.

17.     Defendant Carl Eschenbach ("Eschenbach") is, and at all times relevant hereto has been, a member of the Board. During the Relevant Period, Defendant Eschenbach served as a member of the Audit Committee. According to the Company's public filings, Defendant Eschenbach received $948,046 in compensation from the Company during the fiscal year ended January 31, 2022.

18.     Defendant Michael Gordon ("Gordon") is, and at all times relevant hereto has been, a member of the Board. Defendant Gordon serves as a Chair of the Audit Committee. According to the Company's public filings, Defendant Gordon received $45,000 in compensation from the Company during the fiscal year ended January 31, 2022.

19.     Defendant Kimberly L. Hammonds ("Hammonds") is, and at all times relevant hereto has been, a member of the Board. According to the Company's public filings, Defendant

---

[1] Each holder of Class B common stock is entitled to 35 votes per share of Class B common stock.
[2] Valuations of holdings of Company stock are based on the $15.95 per share closing price of UiPath's stock on April 18, 2023.

Hammonds received $1,558,881 in compensation from the Company during the fiscal year ended January 31, 2022.

20.     Defendant Daniel D. Springer ("Springer") is, and at all times relevant hereto has been, a member of the Board. Defendant Springer serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Springer received $4,582,893 in compensation from the Company during the fiscal year ended January 31, 2022.

21.     Defendant Laela Sturdy ("Sturdy") is, and at all times relevant hereto has been, a member of the Board. Defendant Sturdy serves as Chair of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Sturdy received $949,296 in compensation from the Company during the fiscal year ended January 31, 2022.

22.     Defendant Jennifer Tejada ("Tejada") is, and at all times relevant hereto has been, a member of the Board. According to the Company's public filings, Defendant Tejada received $1,557,631 in compensation from the Company during the fiscal year ended January 31, 2022.

23.     Defendant Richard P. Wong ("Wong") is, and at all times relevant hereto has been, a member of the Board. Defendant Wong serves as Chair of the Compensation Committee. According to the Company's public filings, Defendant Wong received $963,046 in compensation from the Company during the fiscal year ended January 31, 2022.

24.     Defendant Thomas Mendoza ("Mendoza") served as a member of the Board from October 2017 until June 2021.

***Officer Defendant***

25.      Defendant Ashim Gupta ("Gupta") is, and at all times relevant hereto has been, UiPath's CFO. According to the Company's public filings, Defendant Gupta received $22,709,483

in compensation from the Company during the fiscal year ended January 31, 2022. Shortly after the IPO, Defendant Gupta sold over $13 million worth of Company shares between June 2021 and January 2022 at prices as high as $70.76 per share.

26.     Defendant Gupta and the Defendants identified in ¶¶ 15-24 are collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers and/or directors of UiPath, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage UiPath in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of UiPath and its shareholders.

28.     Each director and officer of the Company owes to UiPath and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of UiPath, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and/or officers of UiPath, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

32.     To discharge their duties, the officers and directors of UiPath were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of UiPath were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to UiPath's own Global Code of Conduct;

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting

the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how UiPath conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of UiPath and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that UiPath's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(vii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

33.    At all times relevant hereto, the Individual Defendants were the agents of each other and of UiPath and were at all times acting within the course and scope of such agency.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

34.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

35.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

36.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

37.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors or officers of UiPath, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

38.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

39.     At all times relevant hereto, each of the Individual Defendants was the agent of

each of the other Individual Defendants and of UiPath and at all times acted within the course and

scope of such agency.

**UIPATH'S GLOBAL CODE OF CONDUCT**

40.     The Global Code of Conduct ("Code of Conduct"), begins with a message from

Co-CEOs Robert Enslin and Defendant Dines, stating:

> From our humble roots in an apartment in Romania in 2005 to today, UiPath has come a long way. But our commitment to doing business ethically and with integrity hasn't changed.
>
> This Code of Conduct outlines our values and the policies that govern how we operate with our customers, partners, communities, and each other. Take the time to read it and understand how it applies to everything you do at UiPath.
>
> With every decision and action, we have an opportunity—and an obligation—to represent our values and follow our Code of Conduct.

41.     The Code of Conduct expressly applies to "all employees, freelancers, those

employed by carriers or other contingent workers acting on behalf of UiPath ("UiPathers"), as

well as the Company's business partners," and violations of the Code of Conduct "may result in

discipline, up to and including, termination."

42.     In a subsection titled "**Compliance with the Law**," the Code of Conduct states:

"All UiPathers, as well as its business partners, are expected at all times to strictly obey all

applicable laws and regulations."

43.     With respect to financial disclosure, the Code of Conduct states: "UiPath is

required to maintain accurate financial books and records reflecting the true nature of UiPath's

operations and finances."

44.     In a subsection titled "**Disclosure of Inside Information**," the Code of Conduct

states:

As a UiPather, you may be privy to confidential information of UiPath or its customers or partners that may provide you or anyone to whom you disclose such information an unfair financial advantage as it pertains to the purchasing or selling of equity in such companies. ***The use of such inside information with respect to purchasing or selling equity is unlawful and may lead to civil and/or criminal liability.***[3]

## UIPATH'S AUDIT COMMITTEE CHARTER

45.     UiPath's Audit Committee Charter provides, *inter alia*, that the "purpose of the Audit Committee" is to "oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements" and "help the Board oversee the Company's legal and regulatory compliance, including risk assessment ."

46.     Among the responsibilities delegated to the Company's Audit Committee is the review of the Company's financial statements:

> **Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

47.     With respect to the Company's earnings announcements, the Audit Committee Charter states: "The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies."

48.     With respect to risk management, the Audit Committee Charter states that: "The Committee will review and discuss with management and the Auditors the Company's processes

---

[3] Unless indicated otherwise, all emphasis in this Complaint is added.

and policies on risk identification, management and assessment in all areas of the Company's business."

49.     The Audit Committee Charter further states:

The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

## SUBSTANTIVE ALLEGATIONS

*Background*

50.     UiPath is a global Robotic Process Automation ("RPA") software company founded in 2005. RPA software allows companies to use software "bots" to automate repetitive or mundane tasks including extracting information from documents, data entry, and data management, allowing company employees to prioritize more complex or strategic tasks.

51.     The majority of UiPath's revenues are derived from the sale of software licenses. For example, during 2021, license revenues accounted for 57% of the Company's total revenues. The Company also generates revenue through maintenance and updates to UiPath's software and through technical services. Revenues from the sale of licenses are generally recognized upon delivery, when the customer is able to use and benefit from the software. Maintenance revenues are recognized ratably over the term of the arrangement.

52.     UiPath has highlighted its annualized renewal run-rate ("ARR") as an important indicator of the Company's performance. UiPath defines ARR as annualized invoice amounts per SKU from subscription licenses and maintenance obligations assuming no increases or reductions in customer subscriptions. As a result, ARR distributes income that the Company expects to receive from a contract relatively evenly over an annualized period, as compared to ordinary

revenue recognition, which, as is the case with the Company's license sales, occurs upon delivery. Importantly, ARR does not reflect any actual or expected reductions in invoiced value due to contract non-renewals or cancelations other than for specific bad debt or disputed amounts. UiPath additionally publicly reports Net New ARR, a measure of quarterly ARR growth relative to the prior quarter.

53.     During the COVID-19 pandemic, demand for automation was temporarily inflated, as companies sought to mitigate the operational and financial setbacks brought about by lockdowns and worker shortages. Despite these trends, the UiPath claimed that it was largely unaffected by the pandemic. As Defendant Dines stated during an earnings call on September 7, 2021: "We always said that COVID was net neutral for us. We've seen some business industries accelerating, [we've seen] some deceleration in other industries."

54.     The heightened demand for automation during the pandemic caused established providers of enterprise software, including Microsoft, IBM, Oracle, and Salesforce, to expand into the industry. Notably, in May 2020, Microsoft announced its acquisition of Softomotive, a provider of RPA software, to supplement Microsoft's preexisting automation software offerings. This acquisition expanded Microsoft's capacity for "low-code" automation, enabling Microsoft to offer automation software that is more user-friendly as compared with UiPath's offerings. Further, Microsoft was able to bundle its automation software within its broader suite of already ubiquitous enterprise software for lower prices.

55.     Throughout the Relevant Period, however, the Individual Defendants maintained that Microsoft was not a significant competitor with UiPath as the two companies purportedly operated in slightly different markets. The Individual Defendants characterized Microsoft as a

14

valuable business partner offering complementary products, rather than as a major competitor of the Company.

56.     On April 21, 2021, UiPath completed its initial public offering ("IPO"), issuing over 27.5 million shares of Company stock at a price of $56 per share, raising over $1.5 billion in gross proceeds. Significantly, more than half of the shares sold in the IPO were sold by Company insiders, including Defendant Dines, UiPath's founder, CEO, and Chairman, who sold more than $77 million worth of Company shares in the IPO. Furthermore, the Individual Defendants structured the IPO so as to permit insiders to dump substantial holdings of Company shares soon after the IPO, rather than subjecting insiders to the customary 180-day lockup period. As soon as the abridged lockup period expired, Company insiders continued to offload personal holdings of UiPath stock. Specifically, Defendant Dines sold an additional $2.5 million worth of Company shares in November 2021 at artificially inflated prices, and Defendant Gupta sold $13 million worth UiPath shares between June 2021 and January 2022 at prices as high as $70.76 per share.

57.     Leading up to the IPO, the Individual Defendants misleadingly touted UiPath's "rapid growth" and claimed that the Company, which had yet to attain profitability, had "accelerated its path to profitability." Documents issued in connection with the IPO reported ARR of more than $580 million in the fiscal year ended January 31, 2021, representing year-over-year growth of 65%, and revenues of more than $600 million during the same period, representing year-over-year growth of 81%.

58.     Following the IPO, the Individual Defendants continued to issue false and misleading statements regarding the Company's growth prospects and in particular, its total addressable market ("TAM"). For instance, during a June 8, 2021 investor call, Defendant Gupta stated that "as our results underscore, we are consistently winning these competitive evaluations"

with other automation companies and that "we continue to feel in the discussions here the TAM $60 billion dollars is real, every single industry, every single department, every single process, every single employee . . . . So you can see also customers migrating away from our competitors and to us." The Individual Defendants also misleadingly downplayed competitive threats facing the Company, in particular by Microsoft. For example, during the same investor call on June 8, 2021, Defendant Dines claimed that UiPath's offerings were "very differentiated" from those of Microsoft and stated that comparing the two was "like comparing apples to oranges."

59.     The Individual Defendants' statements overstated UiPath's total addressable market because the Company's expensive products had limited use cases for business that did not need full RPA software. UiPath was also losing market share to lower-cost automation solutions like Power Automate. The Company further lost market share to established enterprise software companies like Microsoft, IBM, and Salesforce who were able to bundle their low-code automation products into their existing enterprise software suites, reducing the need for additional software.

60.     The Individual Defendants engaged in a deceptive scheme to conceal these adverse demand trends until after they had dumped tens of millions of dollars' worth of Company stock at artificially inflated prices. First, leading up to the IPO, UiPath utilized widespread discounts to temporarily inflate client demand. These discounts had the effect of cannibalizing future sales, reducing margins, and increasing customer turnover. Second, because this strategy was unstainable, soon after the IPO the Company began offering "ramping" contracts involving relatively modest initial RPA commitments which could ostensibly grow over time. This created illusory ARR growth, as the relatively profitable later portions of the contracts' terms were averaged over the initial term pursuant to the Company's method of calculating ARR. However,

the Individual Defendants were aware that the Company risked ultimately not obtaining the annualized revenue that was reflected in its ARR figures in the event customers canceled or chose not to renew their contracts.

61.     As a result of the Individual Defendants false and misleading statements, the price of Company stock initially soared above its IPO price, reaching a Relevant Period high of $90 per share in May 2021. The truth with respect to the Individual Defendants' fraudulent scheme eventually emerged, but not before the Individual Defendants sold tens of millions of dollars' worth of personal holdings of Company stock.

62.     On September 7, 2021, UiPath announced its quarterly results for the second quarter of 2022, which revealed a dramatic slowdown in the Company's revenue and ARR growth rates. On the corresponding investor call, Defendant Gupta revealed that the Company's financial results provided in connection with the IPO had been inflated due to previously undisclosed discounting and explained that UiPath was shifting away from discounted contracts and toward a "ramping" contract model. In the following fiscal quarter, the Company reported meager net new ARR growth of just 42%. On the corresponding investor call, Defendant Gupta reiterated that the Company would be continuing to "reduce [its] dependency" on discounted multiyear contracts now that UiPath had "cash in the bank."

63.     On March 30, 2022, the Company reported disappointing revenue and ARR guidance for fiscal year 2023, indicating that the Company's downward growth trajectory was expected to continue.

64.     As a result of these disclosures, the price of UiPath stock fell to a low of less than $22 per share, a decline of more than 75% from the Relevant Period high.

***Materially False and Misleading Statements During the Relevant Period***

65.     The Relevant Period begins on April 21, 2021, when UiPath filed a Prospectus on Form 424B4 with the SEC (the "Prospectus"), which highlighted the Company's "rapid" growth rate:

> ***We have experienced rapid growth***. Our ARR was $351.4 million and $580.4 million in the fiscal years ended January 31, 2020 and 2021, respectively, ***representing a growth rate of 65%***. We generated revenue of $336.2 million and $607.6 million, representing a growth rate of 81%, and a net loss of $519.9 million and $92.4 million in the fiscal years ended January 31, 2020 and 2021, respectively.

66.     The Prospectus attributed the Company's "hyper-growth and market capture" to key investments in 2020 and 2021:

> In fiscal year 2020, we continued to make investments that ***enabled our hyper-growth and market capture,*** and began to focus on realizing the operational leverage inherent in our business model and customer economics. In fiscal year 2021, we continued our focus on demonstrating the operational leverage in our business model, ***while prioritizing investments that will allow us to continue to achieve best-in-class growth and business scale and to capitalize on our significant market opportunity.***

> We have made incredible progress in building a world-class business. Today, we are a company committed to solving for both growth and efficiency and have accelerated our path to profitability while continuing to deliver hyper-growth.

67.     The Prospectus further touted the Company's revenue growth as follows:

> ***Total revenue increased by $271.5 million, or 81%, for the fiscal year ended January 31, 2021 compared to the fiscal year ended January 31, 2020, primarily due to an increase in our licenses revenue of $144.4 million,*** an increase in our maintenance and support revenue of $112.9 million and an increase in services and other revenues of $14.2 million. Approximately 75% of the increase in revenue was attributable to growth from existing customers, and the remaining increase in revenue was attributable to new customers. As we continued to expand our sales efforts in the United States and internationally, our increase in total revenue was consistent across all regions.

68.     On June 8, 2021, UiPath issued a release announcing its financial results for the first quarter of 2022 (the "1Q22 Release"), which revealed ARR of $652.6 million during the quarter, representing a 64% increase year-over-year. The 1Q22 Release further revealed revenues

of $186.2 million during the quarter, representing a 65% increase year-over-year. The 1Q22 Release quoted Defendant Dines attributing the Company's "exceptionally strong" ARR growth to the quality of UiPath's products and its "leadership position in enterprise software automation." The 1Q22 Release further quoted Defendant Gupta as stating: "We have experienced rapid growth and now have over 8,500 customers worldwide, including 1,105 customers with ARR of $100,000 or greater and 104 customers with ARR of $1 million or greater."

69.     Also on June 8, 2021, during an investor call, Defendant Dines stated: "Our leadership position in the RPA market is again demonstrated by our ARR growth. . . . We continue to grow multiples of the market and take market share." Defendant Gupta similarly attributed the Company's "meaningful growth at scale" to its competitive advantage: "And as our results underscore, *we are consistently winning these competitive evaluations."* Defendant Gupta continued: "[T]he opportunity in front of us is enormous and growing. Our strong first quarter results and guidance reflect the growing momentum in our business and the power of our automation flywheel."

70.     In response to a question regarding financial expectations for the remainder of the year, Defendant Gupta stated:

> I just want to start by emphasizing the strength of our quarter. $653 million of ARR and a record quarter of incremental ARR breaking $70 million at $72 million total incremental ARR. When you look at that growth, it was really founded on the fact that *we're continuing to add customers at a really fast pace.* So our customer count is now greater than 8,500 customers. That's up more than 600 sequentially and 2,400 year-over-year. Quite frankly, *this has exceeded our expectations*, and we're looking forward as *our pipeline continues to be strong.*

71.     When asked about the "competitive threat" posed by Microsoft, Defendant Dines stated:

> I would start by saying that we are very differentiated, first of all, in our philosophy towards automation. We have a unique platform that aims to emulate people and

their work. Microsoft has built a low-code/no-code platform whose main goal is to provide new applications and analytics to the people. They are like comparing apples to oranges.

Our approach is extremely difficult to replicate. It requires a huge experience curve that we have built over the last 15 years. Our platform is a combination of UI, API and computer vision AI, that is, again, extremely difficult to replicate and it is our secret sauce.

Moreover, I would say that our differentiations come from the 3 major directions. First of all, *we have this unique end-to-end horizontal platform that is really necessary to win in this space*. And this is a space that is about the highest return on investment and the fastest time to value that I've seen almost ever in the world of enterprise software. We are in a business where we can improve the return of investment. And that was very beneficial throughout our history.

We consistently have proven, and *we have beaten our competitors with our technology*. If you go there and if you can show that you are able to implement in half time, imagine the exponential return on investment that happens when you deploy at scale. And by the way, *we're a technology that is proven to deploy at scale, while I would say that Microsoft's approach has not tested large-scale deployments*.

72.    Defendant Gupta reiterated that the Company's pipeline was "enriched" by gaining market share from its competitors:

[W]e continue to feel in the discussions here the TAM $60 billion dollars is real, every single industry, every single department, every single process, every single employee. *We see that enrich in really the pipeline of what we look at. So you can see also customers migrating away from our competitors and to us*. And that is not just necessarily just about the strength of our individual components, but that is *the strength of our entire platform*.

73.    On June 9, 2021, UiPath filed a quarterly report on Form 10-Q for the fiscal period ended April 30, 2021 with the SEC. That filing contained the same financial information that was contained in the 1Q22 Release.

74.    The statements identified in ¶¶ 64-72 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) UiPath had implemented widespread discounts prior to the IPO to

temporarily inflate the Company's revenue and ARR figures, which ultimately served to cannibalize future sales, erode the Company's margins, and increase client turnover; (ii) the Company's total addressable market was overstated; (iii) UiPath was losing market share to Microsoft, Salesforce, IBM, and other established enterprise software vendors that were able to incorporate automation software into their existing platforms; (iv) UiPath was further losing market share to relatively inexpensive, low-code automation software like Microsoft's Power Automate software; and as a result (v) the Individual Defendants' positive statements regarding UiPath's business, operations, and prospects lacked a reasonable basis.

75.     On September 7, 2021, UiPath issued a release announcing the Company's financial results for the fiscal period ended July 31, 2021 (the "2Q22 Release"), which revealed an unanticipated slowdown in revenue and ARR growth. Specifically, the 2Q22 Release disclosed a drastic decline in UiPath's ARR annual growth rate from 55% in the previous quarter to just 33%. The 2Q22 Release further revealed that growth in the Company's license revenues had fallen from 57% year-over-year in the previous quarter to just 20%. On the corresponding investor call, Defendant Gupta further disclosed the Company's discounting program prior to the IPO its intention to restructure its arrangements with customers and introduce "ramping" contracts, involving relatively modest initial RPA commitments which could ostensibly grow over time. Defendant Gupta stated: "Looking at our pipeline, which is strong across geographies, we see the opportunity to move customers to deal structures with annual ramping, which we expect will lower our overall discounts."

76.     In response to an analyst question, Defendant Gupta further detailed the Company's shift away from discounted deals:

> Billings duration is down, and that is because we've deemphasized prepaid deals given our cash position and our gross retention rate. So when your gross retention

rate is 98%, we ***don't feel kind of compelled to trade any type of discount for long for getting the cash in the door right today***. We're able to make better and better economic decisions from the position of strength.

77.     On this news, the price of UiPath stock fell from $62.46 per share on September 7, 2021 to $54.40 per share on September 9, 2021, a 12% decline. However, the price of Company stock remained artificially inflated because the Individual Defendants continued to issue materially false and misleading statements and to conceal the full truth regarding UiPath's business, operations, and prospects.

78.     The 2Q22 Release announced ARR of $726.5 million during the quarter, a 60% increase year-over-year and further revealed $195.5 million in revenues earned during the quarter, a 40% increase year-over-year. Defendant Gupta attributed these results to UiPath's "competitive differentiation," stating:

> The team executed well this quarter as ***we continue to drive meaningful growth at scale***. Our land and expand go-to-model delivered record net new ARR, ***a testament to our competitive differentiation*** and the power of our platform to drive meaningful return on investment for our customers. Looking ahead, our priority is to continue to drive growth while exercising operational rigor, ***which will allow us to maintain our clear leadership position in this large and growing market***.

79.     Also on September 7, 2021, during an investor call, Defendant Dines touted the Company's customer growth as an indicator of strong demand for automation:

> As of the end of the second quarter, our customer base was more than 9,100. ***And the number of our customers who are leveraging our platform to accelerate automation is growing quickly***. We have 1,247 customers that accounted for at least $100,000 in ARR, up 59% from 785 in the second quarter of last year. This includes 118 customers at $1 million-plus in ARR, up 100% from 59. ***These numbers demonstrate not only the significant demand for automation, but demand for automation at scale***.

80.     Defendant Gupta further attributed UiPath's "meaningful growth at scale" to the Company's "market-leading automation platform" during the call.

81.     In response to an analyst question, Defendant Dines maintained that demand for the Company's products would not be diminished by waning pandemic era restrictions, stating: "As we are getting, hopefully, in the last phase of COVID, we see solid demand in—for our technology, for our platform. We are seeing quite a solid pipeline for the second part of the year." Defendant Gupta agreed, stating:

> I look at the long-term demand signals that we see. Daniel talked about the strength of our pipeline. ***We love our competitive position***. The awareness in the market around our platform is higher than ever, as you can see from a lot of the industry reports that have also come out. ***So we actually feel very positive about the long- term demand coming out of COVID***.

82.     In response to a question regarding volatility in UiPath's net new ARR figures, Defendant Gupta maintained that the Company's pipeline remained "very strong," stating:

> Look, I look at our incremental ARR numbers, the net new ARR that we've been posting, we're very pleased with it. It reflects the investment. It reflects both the strong base – the impact of the strong dollar-based net retention rate as well as the steady execution of new logos. We continue to invest in our sales force. So as we continue to bring up our sales team and ramp up additional reps, which we've been doing, ***I feel very good about the overall trajectory to fulfill the pipeline that we have in front of us, which has grown and is very strong***.

83.     During the call, Defendant Dines again downplayed competitive threats facing the Company:

> So we all know this is a big market growing quickly, and automation is the central piece of the digital transformation. So obviously, all major players in the cloud and the business applications are in our space.
>
> * * *
>
> So Salesforce is seeing a consolidation between low-code/no-code integration and automation. And this is exactly what we have told the market for a long time, and we have expanded into these areas for a long time. With this big release in the fall, you should expect really a smooth integration of our Cloud Elements acquisition that was done in the beginning of this year. So we will make a very well-oiled machine around automation with low-code/no-code that we have introduced a year or something ago. And now we're really combining UI automation and API automation in a very good integrated package.

23

*We believe that our angle towards this consolidated platform is our angle that comes from emulating people is really the one -- that is the winning angle.* All these small acquisitions made me think that still the big software players don't understand how difficult it is to build emulation software.

*This is our bread and butter.* We have built it for a long time. And starting from this angle, we – *it gives us a tremendous opportunity to extend our reach to the entire consolidated automation space.*

84.     Defendant Gupta also claimed that the Company's new "ramping" contracts would lead to "long-term engagement" and increase UiPath's margins:

*This structure creates better ROI for our customers, long-term engagement opportunities for our partners and will yield better overall margins for UiPath. It is also positive for ARR growth, which is our most important metric*, but it can create short-term revenue variability due to the timing of license delivery and GAAP revenue recognition.

85.     In response to an analyst question, Defendant Gupta explained how the ramping model would drive revenue growth:

So what that means is instead of buying simple annual contracts, what we see a larger demand for is getting larger-term commitments from some of our customers. *But the way they look at that is instead of buying 10,000 robots today, they may buy 1,000 robots today, 5,000 next year, 10,000 in year 3. And those – the license deliveries would happen into those years as we go down.*

\* \* \*

And if there's any confusion on ramp, remember what I mean is you can buy robots of 100 per year for a 3-year deal or you can buy robots of 100, 200, 300 in a deal. *And then the licenses for that additional 100 per year gets delivered in subsequent years. [W]hich is why there is – why that creates variability in terms of revenue recognition.*

86.     On September 8, 2021, UiPath filed a quarterly report on Form 10-Q with the SEC for the fiscal period ended July 30, 2021. That filing contained the same financial information that was contained in the 2Q22 Release.

87.    On October 14, 2021, at the Morgan Stanley Spark Conference, Defendant explained how the Company derived its $60 billion total addressable market:

> *So we actually triangulated it multiple ways and independently verified as well. So we've quantified the market at $60 billion-plus.* And we did it very simply. We took our customer base, segmented our companies by the number of employees because that's relatively correlated to complexity and number of processes that are there. We took the top 10% of our customers and said, if every customer in the market could reach these levels of our top 10%, you do that simple math and you get to this number of $60 billion plus in terms of a total available market.
>
> Qualitatively, when you look at it, I live the TAM because I was a customer. So it was the only piece of software, when I was a CFO or a CIO, that could solve problems for legal, HR, finance, supply chain. So it's really relevant to every single department, every single process and every single employee. *When you look at it both qualitative and quantitatively, you can see the massive market that it really is*.

88.    In response to a question about the extent to which the Company was competing with Microsoft, Defendant Dines stated:

> So—and I have high respect for Microsoft, especially under Satya. It's a great company. And we don't compete really with Power Platform. Power Platform, it's a big animal. *We compete within – not even with Power Automate, really*. Within this big platform, we compete with a product called Power Automate Desktop, which Microsoft bought 18 months ago from a Greek company. It's a product that was never really proven in large enterprise deployments. It's something that Microsoft sees more like in a personal productivity gain.
>
> So now, if you look at our business, how it is today, we have unattended space, we have attended space. For unattended space, you need a professional tool to – for professional developers. *This is not – Microsoft doesn't even compete in this space. We've never seen them in a competitive situation for unattended robots. So this is half of our business*.
>
> Now when you speak about attended automation, what this citizen developer tool that Microsoft has competes only for like 1 in 10 of the use cases out there. But what is even more important, when you go head-to-head in terms of products, Microsoft's strategy, at least until now, is to build something that works well within Microsoft ecosystem, like in-app type of automation. Microsoft Power Automate Desktop doesn't work well with SAP, with Salesforce, with ServiceNow. So it works within Microsoft Office technologies.

*But these are very few use cases, low-value use cases. In most of the processes that we are automating, we are seeing like 3 more, 3-plus different types, big categories of applications. So at this point, in reality, I think people are more scared about what Microsoft can do in our space than it's really the reality*.

And there is also something that is very specific about this technology, which is not specific in case of Tableau or in case of Slack. This is an enterprise technology that generates huge return on investment. License pricing, if you use the technology that costs you $5 million a year and you generate $100 million in return on investment a year, would you take a technology that cost you $1 million and will generate only $20 million? I don't think.

*So it's a very – and we can make a very simple return on investment, total cost of ownership, time to value. It's kind of easy because look, when you go to a customer and I – and they go to automation, they have to do something meaningful and measurable. So we have the – use Power Automate, use UiPath, automate this process, put whoever you want to automate and if they see – Microsoft sometimes can struggle 3 weeks to do something we can deliver in 2 hours. We've built this for many years. It's not an easy technology to build. So then the return on investment case, it's so clear*.

89.     In response to a question about competitive pressure from other enterprise software providers, Defendant Dines stated:

*Servicetrace. At least until this point, we really don't compete with ServiceNow or Salesforce. We simply don't compete with them at this point.* And to me, what they built, it's kind of they sprinkle an RPA term, but buying some kind of cheap companies. And it's mostly used for like in-app automation, which like in the case of Microsoft, this is – this doesn't have too much legs to go over.

*So we – in case of ServiceNow, it's also [an] even more stark[] difference between our go-to-markets. They are primarily an IT shop. We sell primarily to business lines, to CFO, to operations. So I see clearly that it's not conflicting. We are actually customers to each other, we and ServiceNow. So we more partner than compete. We don't compete right now at this point in time.*

90.     The statements identified in ¶¶ 74-88 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) UiPath's "ramping" contract model, along with the Individual Defendants' emphasis on the Company's ARR metric created an illusion of high demand for UiPath's products because the low initial commitment induced customers to sign up who would

26

ultimately cancel or opt not to renew their contracts in later time periods; (ii) the Individual Defendants had overstated the Company's total addressable market; (iii) UiPath was losing market share to low-code automation software providers who could offer functionally the same software for a fraction of the price; (iv) UiPath was losing market share to established enterprise software providers like Microsoft, ServiceNow, Salesforce, and IBM who were incorporating automation software into their existing platforms; and, as a result (v) the Individual Defendants' positive statements with respect to the Company's business, operations, and prospects lacked a reasonable basis.

91.     On December 8, 2021, UiPath issued a release announcing the Company's financial results for the fiscal period ended October 31, 2023 (the "3Q22 Release") which revealed more stagnating growth. The 3Q22 Release revealed that UiPath's ARR annual growth rate declined for the third quarter in a row to 58%. The 3Q22 Release further reported 42% year-over-year growth for net new ARR, down from 55% growth rate reported in the 1Q22 Release. During the corresponding call, Defendant Gupta reiterated that the Company was shifting away from discounted multiyear contracts:

> And then in terms of the question around duration, billings duration will continue to contract for us, and we've talked about this multiple times in terms of just our focus now with the cash in the bank that we are going to prioritize more 1-year deals and reduce our dependency on multiyear prepaid deals from a cash flow standpoint. That trend continued in the quarter.

92.     On this news, the price of UiPath's stock fell from $47.61 per share on December 8, 2021 to $44.05 per share on December 10, 2021, a decline of 7%. The price of UiPath's stock remained artificially inflated however, as the Individual Defendants continued to obscure the full truth.

93.      The 3Q22 Release reported ARR of $818.4 million during the quarter, representing a 58% increase year-over-year. The 3Q22 Release further reported $220.8 million in revenues earned during the quarter, a 50% increase year-over-year. The 3Q22 Release quoted Defendant Gupta as stating: "I am pleased with our third quarter fiscal 2022 results as ARR grew 58 percent and trailing twelve-month revenue grew 57 percent year-over-year, once again demonstrating our market leadership."

94.      Also on December 8, 2021, during an investor conference call, Defendant Dines touted the "considerable demand" for UiPath's automation platform:

> In summary, we had a strong Q3, and we continue to drive growth at scale. ***The market is very healthy, and we see considerable demand for our automation platform***. I feel very good about what we have been able to accomplish across the business since our IPO, and we remain focused on innovation and our customers, which we believe is key to our ongoing success.

95.      Later during the call, Defendant Dines reiterated: "[W]e are very pleased with what we are seeing in front of us. We are seeing a strong Q4. It's—the demand is there. We are seeing really very engaged partners. So overall, we are very pleased with the direction where our business is going."

96.      Defendant Gupta similarly touted the Company's purportedly "strong pipeline":

> ***The opportunity in front of us is enormous. We have a strong pipeline***, and we feel very good heading into the end of our first fiscal year as a public company. We are building a truly multigenerational company that will change how people experience work. This is what excites us and motivates the team every day. It also keeps our focus on the long-term value creation for our employees, customers, partners and stockholders.

97.      During the same call, Defendant Dines maintained that UiPath was the "clear leader" among automation software providers, again downplaying the Company's competition:

> In the last quarter, ***we have not seen any material moves in terms of the competitive landscape***. And I would start by pointing to the first IDC MarketScape report that put us in a very clear leadership position. ***And I would quote them saying that***

28

*when it comes to real enterprise automation, real scaled enterprise automation, customers are choosing UiPath.*

And this is, of course, because we offer an end-to-end platform that is suitable from small use cases to the most complex use cases. And indeed, we have this tapestry that we believe it's what helps our customers drive adoption from the process discovery, which is becoming really a driver of growth and helping the adoption, to building automation for both professional developers and citizen developers to strong analytic platforms and to our engagement layer, which is basically our low code, no code app platform, which is really dedicated to automation and integration use cases.

So I would finish my answer saying that automation is really becoming a critical piece of accelerating digital transformation. *We are the clear leader. And we continue to win deals in very large scores because of our technology and our platform*.

98.     With respect to Microsoft specifically, Defendant Dines stated:

In terms of real enterprise traction, UiPath is really the only tangible choice for enterprises that want to go from small to complex across different divisions that want a really high level of penetration.

*Our own data, if we take into account the deals where Microsoft is participating versus the deals where Microsoft is not participating, we are not seeing material changes in our winning rate. So right now, currently, I can say Microsoft has – doesn't have a meaningful impact on our ability to win customers*.

What is going to happen in the next couple of years? First of all, I would like to make a case that Microsoft is focused with their RPA, mostly on citizen developer and personnel productivity. This is a small part of our overall TAM. *So I don't see that in the coming years, Microsoft investment and competing with us will materially derail us from our growth trajectory that we are seeing and we are building right now*.

99.     On December 10, 2021, the Company filed a quarterly report on Form 10-Q for the

fiscal period ended October 31, 2021 with the SEC. That filing contained that same financial

information that was contained in the 3Q22 Release.

100.    On March 30, 2022, the Company issued a release announcing its financial results

for the quarter and year ended January 31, 2022 (the "4Q22 Release"). The 4Q22 Release reported

just $289.7 million in revenues earned during the quarter, representing only 39% year-over-year

growth. The 4Q22 Release further contained deeply disappointing ARR and revenue guidance indicating that the Company's stagnating growth trends were expected to continue. Specifically, the Company announced first quarter 2023 ARR guidance in the range of $960 million to $965 million and fiscal 2023 ARR guidance in the range of $1.2 billion to $1.21 billion. The Company announced first quarter 2023 revenue guidance in the range of $223 million to $225 million and fiscal 2023 revenue guidance in the range of $1.075 billion to $1.085 billion. All of these projections were substantially below consensus analysts' expectations.

101.    Also on March 30, 2022, UiPath filed a separate release on Form 8-K announcing the abrupt departure of the Company's Chief Revenue Officer, Thomas Hansen.

102.    On this news, the price of UiPath common stock fell from $29.04 per share on March 30, 2022 to $21.59 per share on March 31, 2022, a decline of 25% in just one day.

103.    By the first fiscal quarter of 2023, the Company's net new ARR would decline by more than 50% sequentially, to just $51.8 million. The Company's revenue growth rate decreased every quarter between the third fiscal quarter of 2022 and the fourth fiscal quarter of 2023, hitting a meager 7% year-over-year growth in the fourth fiscal quarter of 2023. Likewise, UiPath's ARR growth rate declined each quarter from the fourth fiscal quarter of 2022 to the first fiscal quarter of 2024, falling to just 28% year-over-year growth by the first fiscal quarter of 2024. Importantly, after UiPath hired Co-CEO Robert Enslin, he acknowledged during a September 7, 2022 investor call that Microsoft's competitive pressure significantly impacted the Company's ability to effectively market its products to clients, stating that Microsoft "certainly does have an impact on how we sell and how we position ourselves in certain companies. And that's also the reason why we have to position the platform and get the branding right for the platform."

104.    Ultimately, the price of UiPath stock would decline to 75% below the Relevant Period high.

*Insider Sales*

105.    On April 21, 2021, UiPath completed its IPO, raising more than $1.5 billion in gross proceeds. More than half of all shares sold in the IPO were sold by Company insiders, including Defendant Dines, who sold more than $77 million worth of Company shares in the IPO.

106.    Typically, an IPO would be followed by a 180-day lockup period, whereby insider sales of company stock would be restricted. In the case of the UiPath IPO, however, the Individual Defendants allowed themselves to dump substantial Company shares soon after the offering was completed. Specifically, Defendant Dines sold roughly $2.5 million worth of Company shares in November 2021 at prices above the IPO price, and Defendant Gupta sold over $13 million worth of UiPath shares between June 2021 and January 2022 at prices as high as $70.76 per share.

107.    These insider sales were not part of any regular pattern of sales and were suspicious in terms of timing and amount.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

108.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

109.    UiPath is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

110.    Plaintiff is a current shareholder of UiPath and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights

and retained counsel competent and experienced in derivative litigation.

111.    At the time this action was commenced, the seven-member Board was comprised of Defendants Dines, Botteri, Gordon, Springer, Sturdy, and Wong (the "Director Defendants"), along with Karenann Terrell, who is not a party to this action. Accordingly, Plaintiff is only required to show that four members of the current Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least six members of the current Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

112.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants, knowingly approved and/or permitted the wrongs alleged herein, and they participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the issuance of various false and misleading statements, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, are principal beneficiaries of the wrongdoing alleged herein, failed to take any action to recover the illicit proceeds of the insider sales, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

113.    The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein, and/or failed to take any action to recover from the Individual Defendants who wrongfully profited from the issuance of those materially false and misleading statements. The Director Defendants knew of the

falsity of the misleading statements at the time they were made, and/or upon learning of their falsity failed to clawback the illicit proceeds of insider sales made by the Individual Defendants who made such statements. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

114.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims, and/or the duty to preserve the Company's assets. Specifically, as Board members of UiPath, the Director Defendants knew, or should have known, of the material facts surrounding the Company's overstated total addressable market and its adverse demand and competition trends.

115.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

116.     In addition, Defendants Gordon, Eschenbach, Hammonds, and Springer are not disinterested or independent, and therefore, are incapable of considering a demand because they serve or have served as members of the Audit Committee during the relevant period and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia,* the Company's public disclosures. These Defendants, however, breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the active locations count and the revenue projections based on that count. Therefore,

Defendants Gordon, Eschenbach, Hammonds, and Springer cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

117.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to UiPath's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

118.    Further, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

119.    The Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct.  Significantly, none of the Director Defendants have taken remedial action to redress the conduct alleged herein. Thus, any demand on the current Board would be futile.

120.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation

from their violations of fiduciary duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

121. The acts complained of herein constitute violations of fiduciary duties owed by UiPath officers and directors, and these acts are incapable of ratification.

122. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of UiPath. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of UiPath, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

123. If there is no directors' and officers' liability insurance, then the directors will not cause UiPath to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

124.     Thus, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
### Against the Individual Defendants for
### Breach of Fiduciary Duties

125.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

126.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

127.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

128.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

image and goodwill. Such damage includes, among other things, costs incurred in defending itself

in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide

damages in the Securities Class Action, and damage to the share price of the Company's stock,

resulting in an increased cost of capital, and reputational harm.

130.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

**COUNT II**
**Aiding and Abetting Breaches of Fiduciary Duty**
**Against the Individual Defendants**

131.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

132.    By encouraging and accomplishing the illegal and improper transactions alleged

herein and concealing them from the public, the Individual Defendants have each encouraged,

facilitated and advanced their breaches of their fiduciary duties. In so doing, the Individual

Defendants have each aided and abetted, conspired and schemed with one another to breach their

fiduciary duties, waste the Company's corporate assets, and engage in the illegal conduct

complained of herein.

133.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

**COUNT III**

**Against Defendants Dines and Gupta**
**For Breach of Fiduciary Duties (*Brophy* Claim)**

134.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

135.    During the Relevant Period, Defendants Dines and Gupta held positions with the

Company that provided them access to confidential, proprietary information concerning the

Company's financial condition and future business prospects.  Notwithstanding their duty to refrain

from trading in UiPath's common stock under the circumstances, Defendants Dines and Gupta

sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true

37

state of the Company's finances and future prospects.

136.    The insider sales detailed herein were not part of any regular pattern of sales for Defendants Dines and Gupta and were suspicious in terms of timing and amount.

137.    The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendants Dines and Gupta misappropriated to their own benefit when they sold UiPath stock. At the time of their stock sales, Defendants Dines and Gupta were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. Defendants Dines' and Gupta's sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

138.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

<u>COUNT IV</u>
**Against the Individual Defendants for Violations of § 10(b)
of the Exchange Act and Rule 10b-5**

139.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

140.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

141.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142.    The Individual Defendants violated Section 10(b), of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff.

143.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of UiPath were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

144.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of UiPath, their control over, and/or receipt and/or modification of the materially misleading statements alleged herein, and/or their associations with the Company which made them privy to confidential proprietary information concerning UiPath, participated in the fraudulent scheme alleged herein.

145.    As a result of the foregoing, the market price of UiPath common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of UiPath common stock in purchasing UiPath common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

146.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the

Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

147.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

148.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for**
**Unjust Enrichment**

149.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

150.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of UiPath.

151.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from UiPath that was tied to their performance or to the artificially inflated valuation of UiPath.

152.    Defendants Dines and Gupta were further unjustly enriched with respect insider sales of Company stock.

153.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct

and fiduciary breaches.

154.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

155.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of UiPath and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the Company damages in an amount to be determined at trial as a result of the Individual Defendants' violation of securities law, breaches of fiduciary duties and waste of corporate assets;

C.    Directing UiPath to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect UiPath and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Board's internal operational control functions;

D.    Awarding to UiPath restitution from the Individual Defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: December 5, 2023                    **RIGRODSKY LAW, P.A.**

                                    By:   */s/ Seth D. Rigrodsky*
                                          Seth D. Rigrodsky (#3147)
                                          Gina M. Serra (#5387)
                                          Herbert W. Mondros (#3308)
                                          300 Delaware Avenue, Suite 210
                                          Wilmington, DE 19801
                                          (302) 295-5310
                                          Email: sdr@rl-legal.com
                                                 gms@rl-legal.com
                                                 hwm@rl-legal.com

                                          *Attorneys for Plaintiff Michael*
                                          *Bernstein*